1
2
3                        UNITED STATES DISTRICT COURT
4                              DISTRICT OF NEVADA
5                                    * * *
6   JORGE MIRANDA-RIVAS,                      Case No. 3:16-cv-00663-MMD-CLB
7                        Petitioner,          ORDER
         v.
8   HAROLD WICKHAM,[1] *et al.*,
9                        Respondents.
10

11   **I.    SUMMARY**

12          Petitioner Jorge Miranda-Rivas filed a third amended petition for writ of habeas

13   corpus under 28 U.S.C. § 2254. (ECF No. 56.) A jury convicted Miranda-Rivas of (1)

14   robbery with the use of a firearm; (2) discharging a firearm within or from a structure; (3)

15   grand larceny of a motor vehicle; and (4) assault with a deadly weapon, for which he was

16   sentenced to imprisonment for an aggregate term of 7 years and 2 months to 23 years.

17   (ECF No. 11-3 at 2-3.) Miranda-Rivas unsuccessfully challenged his convictions on direct

18   appeal and in postconviction proceedings. (ECF Nos. 11-11, 11-20.) Miranda-Rivas

19   seeks a writ of federal habeas corpus on the grounds that, *inter alia*, trial counsel was

20   ineffective, certain convictions violate double-jeopardy, and his convictions are

21   unsupported by sufficient evidence. This matter is now before the Court for adjudication

22   on the merits of the remaining grounds of the petition.[2]

23   ///

24

25          [1]According to the state corrections department's inmate locator page, Miranda-
     Rivas is incarcerated at Ely State Prison. The department's website reflects William
26   Gittere is the warden for that facility. At the end of this order, the Court directs the Clerk
     of Court to substitute William Gittere for respondent Harold Wickham underRule 25(d) of
27   the Federal Rules of Civil Procedure.

28          [2]The Court previously granted Respondents' motion to dismiss grounds 1, 2, and
     4 as untimely and Miranda-Rivas's motion to dismiss grounds 10 and 12 after the Court
     determined they are unexhausted. (ECF Nos. 83, 84, 87 88.)

## II.      BACKGROUND[3]

### A.      The Incline Village Chevron attendant was robbed at gunpoint.

K.A.[4] testified that on January 2, 2013, he drove Miranda-Rivas, E.G., and Jorge Torres, in his mother's Buick, to the Tomahawk area of Incline Village, to steal items from unlocked vehicles, and that Miranda-Rivas found an unlocked Subaru with keys inside it. (ECF No. 105 at 63-65, 68-70.) K.A. subsequently drove them in the Buick to the Incline Village Chevron where Torres testified K.A. and Miranda-Rivas talked about robbing the Chevron. (ECF Nos. 105 at 70, 74; 106 at 96-97.) After K.A. paid for gasoline for the Buick, Miranda-Rivas directed him to park behind the Chevron at the old Subway shop. (ECF No. 105 at 74-76.)

E.G. testified he told detectives Miranda-Rivas went into the Chevron wearing a red bandana over his face and carrying a gun. (ECF No. 106 at 74-75.) Torres said Miranda-Rivas took a red bandana lying on the seat between them; however, he admitted he told police he did not see a bandana. (*Id.* at 98-99, 115-16, 133.) K.A. saw Torres give Miranda-Rivas a red bandana but did not see Miranda-Rivas put it on his face; however, he admitted he previously testified he never saw a bandana, and never told police about a bandana. (ECF Nos. 105 at 77-78, 100-01; 106 at 6-7.) K.A. said Miranda-Rivas went into the Chevron while he, E.G., and Torres, remained in the Buick. (ECF No. 105 at 77.)

---

[3]The Court summarizes the relevant state court record for consideration of the issues in the case. The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the evidence in considering the claims.

[4]Per the Court's Local Rules of Practice: "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court, including exhibits, whether filed electronically or in paper, unless the court orders otherwise." LR IA 6-1(a). This includes the names of minor children, thus, only a child's initials should be used. *Id.* Witnesses referred to herein as "K.A." and "E.G.," were minors at the time of the crimes, so the Court refers to them only by their initials. (ECF Nos. 36-26 at 61, 36-27 at 44.)

1        Sean Robertson testified he was the attendant at the Incline Village Chevron and

2    was preparing to close for the night when he walked into the mart, and a man wearing a

3    blue jacket and a red bandanna over his face, put a "silverish gun-metal revolver" with a

4    long nose "somewhat roughly" "right against" his temple. (*Id.* at 18-20, 25-26, 29, 44.) The

5    robber told Robertson, "Give me all the money," but Robertson brushed the robber's arm

6    away. (*Id.* at 29.) The robber then pointed the gun to the side, shot a round, and said,

7    "Give me all the f'cking money."[5] (*Id.* at 28-30.) Robertson immediately set the cash

8    drawer on the counter, and the robber took approximately $450 in bills and ran toward

9    the old Subway shop behind the Chevron. (*Id.* at 30-32.) Robertson said he never would

10    have permitted the robber to take the money had the robber not used threat or force in

11    demanding the money. (*Id.*) Robertson identified the Chevron surveillance video depicting

12    the robber grabbing Robertson's jacket, pushing the gun against his head, firing a shot to

13    the side, and pointing the gun at him.[6] (*Id.* at 32-43.) He described the robber as "slight—

14    definitely not heavyset" and approximately 6', 6'1" tall. (*Id.* at 27-28, 45-46.) He deduced

15    the robber was Hispanic based on the robber's skin color and skin tone. (*Id.*)

16        Robertson described the robber's jacket as a heavy, blue, puffy, hooded, ski jacket

17    and said the jacket in a photograph marked as Exhibit 9 "looks like the same jacket that

18    the individual with the gun" wore during the robbery. (*Id.* at 26-27, 40.) He recognized the

19    "sideways stitching" and "striping on the sleeve." (*Id.*) He identified photographs of the

20    robber wearing the jacket in Exhibits 3A through 3F, and after comparing the jacket

21    depicted in those exhibits with the jacket depicted in Exhibit 9, concluded it looked "pretty

22    darn close" to the same jacket. (*Id.* at 39-40, 44-45.)

23    ///

24    ///

25

26        [5]Washoe County Sheriff Detective Greg Sawyer testified the Chevron is located in an area where the discharge of firearms is prohibited except in self-defense. (ECF No.

27    36-28 at 10-11.)

28        [6]Doug Brown testified he was the manager of the Incline Village Chevron and delivered surveillance video of the robbery to police. (ECF No. 105 at 47-48.) After the robbery, the register was short $472.13. (*Id.* at 50-51.)

**B.     A Subaru was stolen from Incline Village.**

Miranda-Rivas returned to the Buick with cash and distributed some of it to K.A., E.G., and Torres. (ECF Nos. 105 at 79; 106 at 58, 99-101.) K.A. said Miranda-Rivas was laughing, said he pistol-whipped the attendant and shot the gun, and said, "You think this is a f'cking game? Ain't f'cking playing around." (ECF No. 105 at 78-79.) Gonzales said the jacket worn by the robber in Exhibits 3B and 3F is similar to the one Miranda-Rivas wore the night of the robbery. (ECF No. 106 at 56-57, 73-74.) Torres said the jacket depicted in Exhibit 9 appears to be the same jacket Miranda-Rivas wore the night of the robbery but was not certain it was the same jacket. (*Id.* at 97, 115.) K.A. identified Exhibits 9 and 3F as photographs depicting a "dark blue" "fluffy" hooded jacket similar to the one Miranda-Rivas wore when he went into the Chevron the day of the robbery but did not recall whether Miranda-Rivas's jacket had white lines similar to the jacket depicted in the photographs. (ECF No. 105 at 76-77.)

Torres testified Miranda-Rivas said they should get out of town because the Chevron attendant was contacting police, and K.A. drove them to the Subaru. (ECF No. 106 at 100-01.) Torres said the Subaru keys were near the hand brake and he intended to steal the vehicle, but instead made an excuse and gave the keys to Miranda-Rivas. (*Id.* at 102-04, 117-19.) K.A., E.G., and Torres testified Miranda-Rivas drove the Subaru away; however, E.G. and Torres admitted they previously said Torres was with Miranda-Rivas when he drove it away. (ECF Nos. 105 at 103-04; 106 at 8-9, 76-77, 133-34.)

Jacquie Chandler testified she and Joseph Colley owned the Subaru and it was parked at a neighbor's house until she discovered it missing at 7:00 a.m. on the morning of January 3, 2013. (ECF No. 106 at 144-50.) She said it was normally left unlocked, and Colley often left the key in the center console. (*Id.*) The Subaru was later found totaled. (*Id.* at 151.) Chandler identified Exhibit 9 as a photograph of a hooded, puffy, blue, down jacket found tossed on a snowbank 10 to 20 feet from the location where the Subaru was parked when it was stolen. (*Id.* at 154-56, 163-64.) She said the jacket remained on the snowbank until police retrieved it a week later when she and her neighbor recognized the

jacket in a newspaper photograph (Exhibit 3B) depicting the Chevron robber. (*Id.* at 160-63.) Chandler said the newspaper photograph "showed the whole jacket" including the hood, and she recognized the stripping and piping on the jacket in the newspaper photograph were identical to those on the jacket on the snowbank. (*Id.* at 159, 161-62, 166.) Chandler said although the robber's jacket was similar to the jacket found near the Subaru theft, she could not be certain they were the same jacket. (*Id.* at 164-65.)

Torres testified he drove K.A., E.G., and Miranda-Rivas to Reno in the Subaru because they were concerned the Chevron attendant reported the robbery to police. (ECF No. 106 at 121.) K.A. said they stopped to put gasoline in the Subaru at the Chevron in Galena, stopped at a liquor store, and then dropped Miranda-Rivas at the home of his girlfriend, Janet, before he, E.G., and Torres, drove to the San Francisco Bay Area. (*Id.* at 9-15.) E.G. said they dropped off Miranda-Rivas and went to a house party before driving to the Bay Area; however, he admitted he told police they drove directly home after the party. (*Id.* at 79-81.) K.A., E.G., and Torres drove the Subaru in and around Oakland and San Francisco, returned to Lake Tahoe the next day, picked up Miranda-Rivas and Janet, and then went to a Motel 6 in Lake Tahoe. (ECF Nos. 105 at 83-86; 106 at 80-81, 106-09.)

The Motel 6 general manager, Troy Stevenson, provided a video recording, which was played for the jury, depicting Janet Mariscal-Garcia, and a male companion, checking into the motel on January 4, 2013, and identified the motel parking pass issued for the vehicle associated with that room rental. (ECF No. 106 at 217-18, 220, 223-25, 227.) K.A. identified Miranda-Rivas in the motel video with Janet. (ECF No. 105 at 91.)

E.G. said they left the Motel 6 the next day, and he, K.A., and Torres, wore latex gloves so they would not leave fingerprints in the Subaru, until they had an accident and abandoned the vehicle. (ECF No. 106 at 87, 89.) Torres admitted he initially lied to the sheriff by saying he was not inside the Subaru when it crashed. (*Id.* at 111, 136-37.)

///

///

5

### C.     The investigation led to Miranda-Rivas.

Washoe County Sheriff Detective Greg Sawyer testified Eric Barragan, who was injured in the Subaru crash, provided the names of the vehicle occupants, and the Chevron robber's jacket was later found at the site of the Subaru theft. (ECF No. 36-28 at 16.) Sawyer said the jacket "tied the robbery to that vehicle" and "tied the people in the vehicle to the robbery." (*Id.*)

Sawyer testified K.A. and Torres were promised nothing for their testimony. (*Id.* at 11-14.) Sawyer did not release to K.A., or the media, information about the robber pistol-whipping the Chevron attendant, so only individuals involved in the robbery knew that detail. (*Id.*) K.A. told detectives Miranda-Rivas bragged about pistol whipping the Chevron attendant and firing a shot during the robbery. (*Id.*) Sawyer said K.A. and Torres initially gave the same general story, without naming names, because they were afraid of Miranda-Rivas. (*Id.* at 54.) On cross-examination, Sawyer agreed that Torres initially claimed sole responsibility for the vehicle theft but later changed his story. (*Id.* at 54-55.)

Detective Sawyer testified Miranda-Rivas claimed to be with family during the robbery, and at home, not at the Motel 6, on January 4 and 5, 2013. (*Id.* at 30-31, 70-71.) Sawyer, however, identified Miranda-Rivas and his girlfriend, Mariscal, in the motel surveillance video and identified the motel's parking pass as the one recovered from the Subaru. (*Id.* at 71-72.) Sawyer said when a buccal DNA sample was taken from Miranda-Rivas, Miranda-Rivas commented, "When the DNA results come back to me, I'll tell you everything." (*Id.* at 19-20.) Sawyer admitted, however, that DNA tests for the jacket found near the site of the Subaru theft produced too many contributors to draw a definitive conclusion. (*Id.* at 18-19, 56.) Although Mariscal was interviewed, and her home searched, police found no gun. (*Id.* at 24-25.)

Sawyer said he directed the arrest of Miranda-Rivas because the statements of K.A., E.G., and Torres, followed a similar timeline, important details were the same, their stories "matched," and there was corroborating evidence. (*Id.* at 15.) He explained there were discrepancies because "[n]o two people are ever going to see or remember the

same details in a case," but "the general, the important parts of the case, are all very similar," such as Miranda-Rivas's exit from the vehicle, running to the store, returning with cash and distributing it, and their actions after the robbery. (*Id.* at 15-16.)

The Washoe County Sheriff collected bullet fragments from the Incline Village Chevron. (ECF No. 105 at 53-54, 56-59.) The Sparks Police Department retrieved a .38-special bullet from a white GMC Yukon owned by Miranda-Rivas's mother. (*Id.* at 187-89.) Washoe County Sheriff's Detective Arick Dickson testified Miranda-Rivas told detectives he never drove his mother's Yukon and denied involvement in the Chevron robbery. (*Id.* 181-83.) However, Washoe County Deputy Sheriff Suzanne Fisher testified that on October 6, 2012, she encountered Miranda-Rivas driving the Yukon; K.A., E.G., and Torres each testified they previously saw Miranda-Rivas drive a white SUV or GMC Yukon; and Deputy Sheriff Chavez testified Miranda-Rivas's stepfather told him Miranda-Rivas drove his mother's white Yukon. (ECF Nos. 105 at 62-63, 101-02, 184-86; 106 at 46-47, 111-12, 188-89, 191-92.) Washoe County Forensic Examiner Steve Shinmei testified the bullet fragments from the Chevron were consistent with the unfired .38 special bullet found in the Yukon; he also noted, however, that a .38-special is a common bullet and a dozen firearms could have fired it. (*Id.* at 200-06, 208, 211.)

**D.   Miranda-Rivas made incriminating statements to friends and family.**

Detective Sawyer monitored Miranda-Rivas's phone calls from jail and admitted that in the calls, Miranda-Rivas denied participating in the robbery, and never openly admitted committing the robbery; Sawyer noted, however, that Miranda-Rivas also made incriminating remarks. (ECF No. 36-28 at 20-23, 57.) For instance, Sawyer testified the transcript of a January 11, 2013, call between Miranda-Rivas and Mariscal, which was played for the jury, includes her asking Miranda-Rivas the whereabouts of the gun used in the robbery and his reply that he disposed of it. (*Id.* at 23-25.) Miranda-Rivas told his mother, "[I]f they ask, you tell them that I have never driven [the white truck]." (ECF Nos. 36-1 at 66; 36-28 at 28-29.) Sawyer explained Miranda-Rivas's use of his mother's white Yukon was significant because "the bullet was located in the rear of the vehicle." (ECF

No. 36-28 at 29.) Detective Sawyer read to the jury portions of recorded call transcripts in which Miranda-Rivas and his brother, Jonathan, discussed hiding evidence from police, including a gun and bullets, that police found "the jacket," and others "snitched" to police. (ECF Nos. 36-1 at 69; 36-28 at 31-50.) Sawyer read to the jury various excerpts from a January 11, 2013, call, including:[7]

> Miranda-Rivas: [D]id they [search] the house or what?
>
> Jonathan: No, fool, they didn't. I got all that shit, though, fool . . . from your jacket.
>
> . . . .
>
> Miranda-Rivas: Ah, good thing, because they're looking for it, so put it away.
>
> Jonathan: Yeah, fool . . . they don't got shit, fool . . . right now I got everything guey [sic] . . .
>
> Miranda-Rivas: Alright that's cool . . .
>
> Jonathan: . . . like everything packet up in your jacket . . . they don't got shit, fool.
>
> Miranda-Rivas: Then that's what's up . . . f'cking . . . hide it well, dude . . .
>
> Jonathan: Yeah . . .
>
> Miranda-Rivas . . . they shouldn't find it at all. Put it in your room . . .
>
> Jonathan: Well, right now I have it hidden . . . no, dude, right now I have it hidden somewhere, but tomorrow . . . I'm just gonna f'cking put it out . . . ain't nobody gonna see this shit.
>
> . . . .
>
> Jonathan: Yeah, dude . . . tell them they don't got [sic] anything, dude . . . I got everything, dude . . . tomorrow I'm going to have everything hidden, nothing and dude . . . tell all your homies that you got nothing, dude.
>
> Miranda-Rivas: The thing is, one of them . . . snitched . . .
>
> Jonathan: I know, fool . . .
>
> Miranda-Rivas: Edgar . . . Edgar snitched.
>
> Jonathan: It was f'cking Erick . . . Erick Barragan or something like that, dude.
>
> Miranda-Rivas: Eric—and then from them, they went to Edgar . . .

---

[7]The Court uses the telephone transcriptions/translations in summarizing these excerpts as the transcripts were admitted into evidence by stipulation. (ECF No. 36-28 at 26.)

. . . .

Jonathan: I know all that shit went down and shit . . . dude, I got . . . everything, everything dude . . . they don't got proof . . . they don't got proof of that shit.

Miranda-Rivas: Like what or what . . . did I make the news? Am I in the news, or what?

Jonathan: Mhm . . .

Miranda-Rivas: Am I in the news, or what?

Jonathan: Mhm . . .

Miranda-Rivas: Am I in the news, or what?

Jonathan: No, just your . . . just the pictures I showed you.

Miranda-Rivas: Oh . . . but they, they don't got proof . . . of nothing.

Jonathan: No, dude, so . . .

Miranda-Rivas: Just that . . . snitching . . . and that they found the jacket, but they want to take DNA and all that shit, they took my DNA, but . . . [unintelligible.]

Jonathan: Yeah, fool, what I heard is that you dropped that jacket in that sube and shit . . . and the owner of the sube, or whatever . . . had that jacket, and he found it on the news.

Miranda-Rivas: How you know about it?

. . . .

Jonathan: Yeah, but . . . if they don't find no gun or no f'cking bullets, they don't got shit, fool . . .

Miranda-Rivas: But apparently they found one in my mom's car . . . in the white truck.

Jonathan: In my mom's car? . . . in the white truck?

Miranda-Rivas: That is what they said that they found one . . .

Jonathan: A bullet?

. . . .

Jonathan: . . . they arrested you, dude . . . and I went to your house . . . and you told me you had all your shit in the jacket I got like seven bullets there . . .

Miranda-Rivas: Yes? . . .
Jonathan: I got the gun and hide [sic] it in my mom's room and shit . . .

1

2
Miranda-Rivas: No, no, take it now . . . they're recording this shit . . . they're
listening . . .

3
. . . .

4
Jonathan: If they don't find that jacket . . . you . . . the bullets or the car . . .
It ain't go [sic] be shit . . .

5

6
Miranda-Rivas: They found the jacket, they found the jacket.

7
Jonathan: I know they found the jacket, cause they told me, fool.

8
. . . .

9
Jonathan: And I told you, fool, never keep f'cking evidence . . . I told you . .
. I always told you, fool . . . I never keep f'cking evidence . . . burn that shit
fool . . .

10
Miranda-Rivas: You was [sic] right . . . .

11

12
(ECF Nos. 36-1 at 69-71, 73-74, 76-77; 36-28 at 31-35, 38-41.) Detective Sawyer testified

13
he believed "Edgar" referred to E.G. and "sube" referred to the Subaru. (ECF No. 36-28

14
at 34-35.) Detective Sawyer also read from a January 14, 2013, call transcript:

15

16
Miranda-Rivas: Ok, but . . . it's just that I heard my mom . . . that they said
that they went to the house looking for a little BB gun they had [sic] her at
gunpoint and shit . . .

17

18

19
Jonathan: Well, they didn't have me a . . . they came like . . . it's weird
because they thought I had it like, I don't know for . . . Me and my uncle,
you know, my uncle Eddie we went to Nevada City and Sacramento and
they were like "you did something" and I said . . . we went and go do the
birth certificates . . .

20
. . . .

21
Miranda-Rivas: And what they . . . they took the BB gun or what?

22
Jonathan: I don't know . . . I think . . . but . . .

23
Miranda-Rivas: No, but I'm saying . . . mine, dude . . .

24
Jonathan: BB . . . yeah . . . no, the . . . I don't know.

25
Miranda-Rivas: Do you still have it? Everything . . . is everything okay?

26
Jonathan: Yes.

27
Miranda-Rivas: Are you sure?

28
Jonathan: Yeah, but me and my uncle we're f'cking scared . . .

10

Miranda-Rivas: Well, clean it, dude . . . get a towel and clean it and take [sic] out of the house . . .

. . . .

Miranda-Rivas: Is your hand on it?

Jonathan: No . . .

Miranda-Rivas: Okay, well, because if they find it, I am f'cked . . .

(ECF Nos. 36-1 at 82-83; 36-28 at 45-46.) Detective Sawyer testified he believed "BB gun" was a coded reference to the gun used in the robbery. (ECF No. 36-28 at 58.)

K.A. testified he received a postcard from Miranda-Rivas, which read in part: "You know you weren't with me. I don't know why they trying [sic] to say you was [sic]. They just trying to scare you" and "You ain't had nothing to do with nothing so don't let them fool you." (ECF Nos. 36-1 at 62-63; 105 at 86-91.) The postcard further states, "You think things are going bad, but there's nothing they can prove against you." (*Id.*) K.A. said the Spanish portion of the message read, "[r]emember, you were never with me, and you said more than you're supposed to. You have thrown your future away." (*Id.*) K.A. said he was nervous when he received the postcard because he had already talked to detectives. (*Id.*)

**E.    K.A., Torres, and E.G. were charged with related crimes.**

K.A. was 17 years old at the time of the crimes and charged with robbery with a deadly weapon and grand larceny of a motor vehicle. (ECF No. 105 at 61, 92-93.) K.A. said when he first met with two detectives, he made up a story, withheld information, and did not tell the truth. (*Id.* at 95-96.) He said a couple of days later another detective met with him, and he told that detective the truth, which is no different than his trial testimony. (*Id.*) He did not agree to talk to the detectives in exchange for a specific deal. (*Id.*) He hoped for a benefit from his testimony, understood it depended on whether his testimony was truthful, and affirmed he was truthful. (*Id.* at 93, 95.) E.G. was 17 years old at the time of the crimes and pleaded guilty to conspiracy to commit robbery and conspiracy to commit grand larceny. (ECF No. 106 at 43-44, 64-65.) He believed he would receive no benefit from his testimony. (*Id.* at 65-66.) He never spoke with Torres or K.A. after his

1  arrest and spoke with no one about what he was going to tell the police. (*Id.* at 91-92.)

2  Torres pleaded guilty to conspiracy to commit robbery and intimidating a witness and said

3  he stood to benefit by his testimony. (*Id.* at 112-13.)

4  **III.   LEGAL STANDARD**

5      **A.   Antiterrorism and Effective Death Penalty Act ("AEDPA")**

6          Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a

7  federal court may not grant a petition for a writ of habeas corpus on any claim that was

8  adjudicated on the merits in state court unless the state court decision was "contrary to,

9  or involved an unreasonable application of, clearly established Federal law," as

10  determined by United States Supreme Court precedent, or was "based on an

11  unreasonable determination of the facts in light of the evidence presented in the State

12  court proceeding." 28 U.S.C. § 2254(d).

13          A state court's decision is contrary to clearly established Supreme Court precedent

14  within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court applies a rule that

15  contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state

16  court confronts a set of facts that are materially indistinguishable from a decision of [the

17  Supreme] Court and nevertheless arrives at a result different from [Supreme Court]

18  precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529

19  U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state

20  court's decision is an unreasonable application of clearly established Supreme Court

21  precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the

22  correct governing legal principle from [the Supreme] Court's decisions but unreasonably

23  applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529

24  U.S. at 413). "The 'unreasonable application' clause requires the state court decision to

25  be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly

26  established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at

27  409-10, 412) (internal citation omitted).

28  ///

1   The Supreme Court has instructed that "[a] state court's determination that a claim

2   lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

3   on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101

4   (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court

5   has stated that "even a strong case for relief does not mean the state court's contrary

6   conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen*

7   *v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as "a difficult-to-meet"

8   and "highly deferential standard for evaluating state-court rulings, which demands state-

9   court decisions be given the benefit of the doubt.") (internal quotation marks and citations

10  omitted)). The petitioner carries the burden of proof. *See Pinholster*, 563 U.S. at 181.

11  Where there is no clearly established federal law—*i.e.*, no holding from the

12  Supreme Court—stating a particular standard or rule at the time of the state court's

13  decision, then, by definition, a petitioner cannot establish under AEDPA that the state

14  court's decision was either contrary to or an unreasonable application of clearly

15  established federal law. *See, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *see*

16  *also Williams,* 529 U.S. at 390, 412 (Interpreting "[t]he meaning of the phrase 'clearly

17  established Federal law, as determined by the Supreme Court of the United States'"

18  contained in 28 U.S.C. § 2254(d)(1) as referring to "the holdings, as opposed to the dicta,

19  of the [Supreme] Court's decisions as of the time of the time of the relevant state-court

20  decision."). A state court need not cite Supreme Court cases nor even be aware of

21  Supreme Court cases so long as neither the reasoning nor the result of the state-court

22  decision contradicts them. *Early v. Packer*, 537 U.S. 3, 8, (2003).

23  **B.    Effective Assistance of Counsel**

24  On a petitioner's claims of ineffective assistance of counsel, he must demonstrate

25  (1) the attorney's "representation fell below an objective standard of reasonableness[;]"

26  and (2) the attorney's deficient performance prejudiced the petitioner such that "there is

27  a reasonable probability that, but for counsel's unprofessional errors, the result of the

28  proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88,

13

694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). In considering an ineffective assistance of counsel claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689-90. A petitioner making an ineffective assistance claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. In considering such claims, a court is obligated to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Under *Strickland*, strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. It is the petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

To establish prejudice, it is not enough for the petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy either question, the court need not consider the other. *Id.* at 697.

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and §

1  2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'"

2  *See Richter,* 562 U.S at 105 (internal citations omitted); *see also Cheney v. Washington*,

3  614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland*

4  determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply;

5  hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing

6  *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

7  **IV.    DISCUSSION**

8         In the Petition, Miranda-Rivas states seven remaining grounds for relief. Miranda-

9  Rivas states four grounds arguing that his counsel was ineffective, two grounds arguing

10 that the evidence was insufficient to convict him, and one ground that his conviction

11 violated the Double Jeopardy Clause. The Court addresses each in turn.

12       **A.    Ground 3—Failure to Introduce Video Recording**

13        In ground 3, Miranda-Rivas alleges trial counsel was ineffective in violation of the

14 Sixth and Fourteenth Amendments by failing to present a video recording depicting the

15 accomplices purchasing fuel for the Subaru in Galena. (ECF No. 56 at 21-22.) He

16 contends the video would have been exculpatory because it would have shown he did

17 not accompany the accomplices when they committed the crimes. (*Id.*)

18       The state appellate court denied this claim in postconviction proceedings:

19       To establish ineffective assistance of trial counsel, a petitioner must
         demonstrate counsel's performance was deficient in that it fell below an
20       objective standard of reasonableness, and resulting prejudice such that
         there is a reasonable probability, but for counsel's errors, the outcome of
21       the proceedings would have been different. *Strickland v. Washington*, 466
         U.S. 668, 687 (1984).
22       . . . .
         Both components of the inquiry must be shown. *Strickland*, 466 U.S. at 697.
23       We give deference to the court's factual findings if supported by substantial
         evidence and not clearly erroneous but review the court's application of law
24       to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164,
         1166 (2005).
25       . . . .
         [M]iranda-Rivas claimed trial counsel was ineffective for failing to introduce
26       evidence in support of his defense. Miranda-Rivas argued trial counsel
         should have introduced and played a video recording of his accomplices
27       purchasing gas after the robbery because the recording would have clearly
         demonstrated he was not with them. The district court found trial counsel
28       may have been deficient for not introducing surveillance video from Galena
         Chevron Gas Station—if it existed and if it conclusively demonstrated

                                           15

1

2

3

4

5

> Miranda-Rivas was not present at the gas station with his accomplices.
> However, the district court further found Miranda-Rivas could not
> demonstrate prejudice because, even if trial counsel had introduced the
> video evidence and substantially impeached the testimony of his
> accomplices, there was more than sufficient evidence to establish his
> identity as the perpetrator of the crimes. The district court's findings are
> supported by the record and we conclude it did not err in dismissing this
> claim.

6    (ECF No. 11-20 at 2-4.)

7          The state appellate court's determination is neither contrary to nor an

8    unreasonable application of *Strickland's* prejudice prong and is not based on an

9    unreasonable determination of the facts. Surveillance video from the Galena Chevron

10   might have impeached the credibility of the accomplice testimony had it conclusively

11   established Miranda-Rivas was not in the company of the accomplices following the

12   offenses, but it would not have been exculpatory. There is no reasonable probability such

13   video would establish an alibi for the time of the robbery and vehicle theft, which predated

14   the trip to Galena, or contradict Miranda-Rivas's incriminating statements. After police

15   questioned and searched his girlfriend's home, Miranda-Rivas told his girlfriend he threw

16   away the gun. He told his mother to tell police he never drove the car where police found

17   a bullet that was consistent with the bullet fired during the commission of the Chevron

18   robbery. In a call with his brother, Miranda-Rivas asked whether he was on the news, and

19   his brother told him "just the pictures" he had shown to him. Miranda-Rivas told his brother

20   police had no proof except a snitch and the jacket, and Detective Sawyer testified in his

21   opinion the reference to a snitch was a reference to E.G. Miranda-Rivas's brother told

22   him the Subaru owner found the jacket and Miranda Rivas asked how his brother knew

23   about it. In his interview with the sheriff, Miranda-Rivas told them, "When the DNA results

24   come back to me, I'll tell you everything." And, in his postcard to K.A., Miranda-Rivas told

25   him, "You know you weren't with me."

26         On this record, fair-minded jurists could conclude the state appellate court

27   reasonably applied *Strickland*'s prejudice prong in determining that given Miranda-Rivas's

28   incriminating statements to friends and family and the other evidence, there is no

1   reasonable probability that impeaching the accomplices with video showing Miranda-
2   Rivas was not present at the Galena Chevron following the crimes, would have resulted
3   in a different outcome. Accordingly, Miranda-Rivas is not entitled to relief on ground 3.

4   **B.    Ground 5—Failure to Challenge Sufficiency of Corroborating**
5   **Evidence for the Grand Larceny Accomplice Testimony**

6   In ground 5, Miranda-Rivas alleges trial counsel was ineffective in violation of the
7   Sixth and Fourteenth Amendments by failing to challenge the sufficiency of corroboration
8   for the accomplice testimony on the grand larceny conviction. (ECF No. 56 at 24-26.)

9   **1.    Applicable Law**

10  "A person who intentionally steals, takes and carries away, drives away or
11  otherwise removes a motor vehicle owned by another person commits grand larceny of
12  a motor vehicle." NRS § 205.228(1), *as amended by* Laws 2011, c. 41, § 15.

13  An "accomplice" is "one who is liable to prosecution, for the identical offense
14  charged against the defendant on trial in the cause in which the testimony of the
15  accomplice is given." NRS § 175.291(2). Accomplice testimony cannot be used to support
16  a conviction unless "the accomplice is corroborated by other evidence which in itself, and
17  without the aid of the testimony of the accomplice, tends to connect the defendant with
18  the commission of the offense." NRS § 175.291(1) It is not sufficient if the corroboration
19  merely shows the commission of the offense or the circumstances thereof. *Id.*

20  Corroborative evidence of an accomplice "may be either direct or circumstantial,"
21  "can be taken from the evidence as a whole," and "'need not in itself be sufficient to
22  establish guilt'—'it will satisfy the statute if it merely tends to connect the accused to the
23  offense.'" *Heglemeier v. State*, 903 P.2d 799, 803 (Nev. 1995) (internal and other citations
24  omitted). "Corroborating evidence, however, must independently connect the defendant
25  with the offense; evidence does not suffice as corroborative if it merely supports the
26  accomplice's testimony." *Id.* "[W]here the connecting evidence 'shows no more than
27  an opportunity to commit a crime, simply proves suspicion, or is equally consonant with

28

1    a reasonable explanation pointing toward innocent conduct on the part of the defendant,

2    the evidence is to be deemed insufficient.'" *Id.* at 803-04 (citations omitted).

3         Under NRS § 175.381(2), a state district court may "on a motion of a defendant or

4    on its own motion," set aside a jury verdict and enter a judgment of acquittal "if the

5    evidence is insufficient to sustain a conviction."

6         **2.    Analysis**

7         On postconviction review, the state appellate court rejected a claim that trial

8    counsel was ineffective in failing to move for acquittal based on insufficient corroborating

9    evidence for the accomplices' testimony on the grand larceny conviction:

10        [M]iranda-Rivas claimed trial counsel was ineffective for failing to move for
         a mistrial based on insufficient evidence to support the grand-larceny-of-a-
11        motor-vehicle count. Miranda-Rivas argued the only evidence of this crime
         was the uncorroborated testimony of his accomplices and a blue jacket that
12        was found in the vicinity of the stolen vehicle. The district court found the
         Nevada Supreme Court had rejected Miranda-Rivas' sufficiency challenge
13        on direct appeal, there was sufficient evidence to corroborate the
         accomplices' testimonies as to the grand-larceny-of-a-motor-vehicle
14        charge, and trial counsel was not deficient for failing to move for a mistrial
         on this ground. The district court's findings are supported by the record and
15        we conclude it did not err in dismissing this claim. *See Miranda-Rivas v.
         State*, Docket No. 64687 (Order of Affirmance, October 15, 2014); *Donovan*,
16        94 Nev. at 675, 584 P.2d at 711.

17   (ECF No. 11-20 at 6.)

18        The state appellate court's determination is neither contrary to nor an

19   unreasonable application of *Strickland*'s performance prong and is not based on an

20   unreasonable determination of the facts. The state district court instructed the jury that

21   "[a] conviction shall not be had on the testimony of an accomplice unless he or she is

22   corroborated by other evidence" which "without the aid of the testimony of the accomplice,

23   tends to connect the defendant with the commission of the offense." (ECF No. 36-29 at

24   31.) The instructions cautioned that "[e]vidence to corroborate accomplice testimony does

25   not suffice if it merely casts grave suspicion on the defendant." (*Id.* at 32.) The instructions

26   directed the evidence required for corroboration of an accomplice's testimony "need not,

27   in itself, be sufficient to establish guilt[;]" rather, corroboration is satisfied if "evidence,

28

1  independent of the accomplice testimony, tends to connect the accused with the

2  commission of the offense." (*Id.* at 33.)

3      In closing arguments, trial counsel and the State attorney each explained those

4  instructions to the jury and further explained the corroboration requirement was necessary

5  to prevent convictions based solely on statements of accomplices who have motives for

6  placing the blame on another person. (ECF No. 36-28 at 105-07, 146-47.) Trial counsel

7  argued the accomplices' testimony lacked corroboration because neither the jacket, the

8  bullet, nor the phone calls, provided sufficient corroboration. (*Id.* at 106-08, 134-36.) The

9  State argued the evidence concerning the jacket, the bullet, and Miranda-Rivas's

10 comments in the context of his phone conversations provided the necessary

11 corroboration for the accomplices' testimony. (*Id.* at 145-50.)

12     A reasonable attorney could conclude there was sufficient independent

13 corroborating evidence for the jury to consider the accomplices' testimony for the grand

14 larceny conviction. The Chevron robbery depicted the robbery wearing a jacket. Police

15 discovered a similar jacket at the location where the Subaru was stolen. Miranda-Rivas

16 told his brother the jacket was found and police had no evidence against him except the

17 snitch and the jacket. Miranda-Rivas's brother told him he heard the Subaru owner found

18 the jacket and Miranda-Rivas asked how he knew about it. An objectively reasonable

19 attorney could conclude, on the whole, that the jacket and Miranda-Rivas's comments,

20 tended to connect him to the Subaru theft.

21     The state appellate court reasonably applied *Strickland* in determining counsel's

22 failure to move for acquittal for the grand larceny conviction was not deficient

23 performance. Thus, Miranda-Rivas is not entitled to federal habeas relief on ground 5.

24     **C.   Ground 6—Failure to Move for Severance of Grand Larceny Charge**

25     In ground 6, Miranda-Rivas claims trial counsel's failure to request severance of

26 the grand larceny charge from the charges related to the Chevron robbery, constitutes

27 ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments.

28

1  (ECF No. 56 at 26-28.) He claims the grand larceny of the Subaru vehicle was not part of
2  the same scheme or plan as the Chevron robbery. (*Id.*)

3          **1.**    **Applicable Law**

4        "Two or more offenses may be charged in the same indictment or information in a
5  separate count for each offense if the offenses charged" are (1) "[b]ased on the same act
6  or transaction;" or (2) "[b]ased on two or more acts or transactions connected together or
7  constituting parts of a common scheme or plan." NRS § 173.115, *added by* Laws 1967,
8  p. 1413; *see also Farmer v. State*, 405 P.3d 114, 118-19 (Nev. 2017). Other crimes,
9  wrongs or acts, may also be admissible to prove "motive, opportunity, intent, preparation,
10  plan, knowledge, identity, or absence of mistake or accident." NRS § 48.045(2), *as*
11  *amended by* Laws 1975, p. 1131.

12        When determining whether a common scheme or plan exists, courts must conduct
13  a fact-specific analysis examining "whether the offenses share such a concurrence of
14  common features as to support the inference that they were committed pursuant to a
15  common design." *Farmer*, 405 P.3d at 121. Relevant factors include: (1) degree of
16  similarity of offenses; (2) degree of similarity of victims; (3) temporal proximity; (4) physical
17  proximity; (5) number of victims; and (6) other context-specific features. *Id.* at 699 (internal
18  citations omitted). No one factor is dispositive, and each factor may be assessed different
19  weight depending on the circumstances. *Id.*

20        In the context of joinder of counts and defendants, the United States Supreme
21  Court has stated: "Improper joinder does not, in itself, violate the Constitution. Rather,
22  misjoinder will rise to the level of a constitutional violation only if it results in prejudice so
23  great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v.*
24  *Lane*, 474 U.S. 438, 466 n.8 (1986). The Ninth Circuit has declared this comment in *Lane*
25  constitutes dicta. *See Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010) ("*Lane*
26  dealt with the joinder of standards under Federal Rules of Criminal Procedure 8 and 52;
27  no constitutional issue was before the Court."). Assuming that the United States Supreme
28  Court's footnote in *Lane* could be considered Federal law, misjoinder of counts may

1   violate federal due process only if it "resulted in an unfair trial." *Davis v. Woodford*, 384

2   F.3d 628, 638 (9th Cir. 2004) (quoting *Sandoval v. Calderon*, 241 F.3d 765, 771-72 (9th

3   Cir. 2001)); *see also Bean v. Calderon*, 163 F.3d 1073, 1084 (9th Cir. 1998). To establish

4   prejudice, impermissible joinder must have "had a substantial and injurious effect or

5   influence in determining the jury's verdict." *Davis*, 384 F.3d at 638 (quoting *Sandoval*, 241

6   F.3d at 772.) In making that determination, the focus is on "cross-admissibility of evidence

7   and the danger of 'spillover' from one charge to another, especially where on charge or

8   set of charges is weaker than another." *Id.*

9               **2.      Analysis**

10          On direct appeal, the Nevada Supreme Court rejected a claim that the trial court

11   erred in failing to *sua sponte* sever the grand larceny charge from the other charges:

12          [A]ppellant argues that the district court erred by failing to sua sponte sever
            the grand larceny of a motor vehicle charge because it was not a connected

13          part of a common scheme or plan with the other charges. *See* NRS
            173.115. We review this claim for plain error because appellant did not

14          move to sever the counts. *See* NRS 178.602. "In conducting plain error
            review, we must examine whether there was 'error,' whether the error was

15          'plain' or clear, and whether the error affected the defendant's substantial
            rights." *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003).

16
            Appellant claims that severance was warranted because the theft of
17          the Subaru and the accomplices' subsequent trip to San Francisco in the
            vehicle occurred after the robbery, the story of the robbery could easily be

18          told without reference to the stolen vehicle, and the robbery and the theft of
            the Subaru were motivated by different concerns. He argues that he was

19          prejudiced by the failure to sever because, as argued above, there was
            insufficient evidence of the grand larceny of a motor vehicle charge absent

20          the accomplices' testimonies.

21                  [FN 1] Although we could treat the State's failure to
            respond to this claim as a confession error, *see Polk v. State*,

22          126 Nev.     ,     , 233 P.3d 357, 359-60 (2010); *Bates v.
            Chronister*, 100 Nev. 675, 681-82, 691 P.2d 865, 870 (1984),

23          we decline to do so where, as here, the claim clearly lacks
            merit.

24
            The record demonstrates that joinder was appropriate under NRS
25          173.115(2), which allows joinder if the charged offenses are based on "acts
            or transactions connected together or constituting parts of a common

26          scheme or plan." *See Weber v. State*, 121 Nev. 554, 572-73, 119 P.3d 107,
            120 (2005) (defining "scheme or plan" and "connected together"). It was the

27          jacket that was worn in the robbery, later located next to where the Subaru
            had been stolen, that connected the robbery to the theft of the Subaru and

28          the people in the Subaru to the robbery. Further, appellant fails to
            demonstrate that his substantial rights were affected as we concluded

                                                21

1
2
3

> above that there was sufficient independent evidence to corroborate the accomplices' testimony and to convict him of grand larceny of a motor vehicle. Therefore, we conclude that the district court did not err by failing to sever the charge.

4   (ECF No. 11-11 at 4-5.)

5       On postconviction review, the state appellate court denied the claim that trial

6   counsel was ineffective in failing to request severance of the grand larceny charge from

7   the other charges:

8
9
10
11
12
13

> [M]iranda-Rivas claimed trial counsel was ineffective for failing to move to sever the counts. Miranda-Rivas argued the theft of the vehicle was not connected to the robbery because it happened after the robbery was committed. The district court found the Nevada Supreme Court had rejected Miranda-Rivas' severance challenge on direct appeal, severance of the charges was not warranted, the joinder was appropriate under NRS 173.115(2), and trial counsel was not deficient for failing to move to sever the counts. The district court's findings are supported by the record and we conclude it did not err in dismissing this claim. *See Miranda-Rivas v. State*, Docket No. 64687 (Order of Affirmance, October 15, 2014); *Donovan*, 94 Nev. at 675, 584 P.2d at 711.

14   (ECF No. 11-20 at 6-7.)

15       The state appellate court's determination that trial counsel did not perform

16   deficiently in failing to move to sever the grand larceny charge from the other charges is

17   neither contrary to nor an unreasonable application of *Strickland*'s performance prong

18   and is not based on an unreasonable determination of the facts. The Nevada Supreme

19   Court, as the final arbiter of state law, determined on direct appeal that joinder was proper

20   as a matter of state law and that joinder did not adversely affect Miranda-Rivas's

21   substantial rights. The record supports those determinations. The jury was instructed to

22   consider each offense separately, uninfluenced by the jury's decision as to any other

23   count. (ECF No. 36-29 at 7.) There was evidence tying the jacket worn by the Chevron

24   robber, as depicted in the Chevron surveillance video, to the jacket found at the scene of

25   the Subaru theft. Miranda-Rivas's brother informed him that he heard the Subaru owner

26   found the jacket and Miranda-Rivas implicitly admitted his connection to the jacket and

27   the Subaru theft when he said the only proof the police had was the jacket and the snitch.

28   Moreover, Torres's testimony that Miranda-Rivas's motivation to steal the Subaru was to

1   evade police detection would have demonstrated consciousness of guilt for the Chevron

2   robbery. On this evidence, an objectively reasonable attorney could determine the grand

3   larceny of the vehicle charge was part of a common scheme or plan with the offenses for

4   the Chevron robbery, and was cross-admissible in separate trials, and a severance

5   motion futile.

6           As such, the state appellate court reasonably concluded trial counsel did not

7   perform deficiently in failing to move to sever the grand larceny charge from the other

8   charges and Miranda-Rivas is not entitled to federal habeas relief for ground 6.

9           **D.    Ground 7—Failure to Raise Double Jeopardy Challenges**

10          In ground 7, Miranda-Rivas alleges trial counsel's failure to request dismissal of

11  his convictions as violative of double jeopardy under the Fifth Amendment constituted

12  ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments.

13  (ECF No. 56 at 28-30.) Miranda-Rivas contends his convictions for assault with a deadly

14  weapon and discharge of a firearm within or from a structure violate double jeopardy

15  because they are lesser-included offenses of robbery with the use of a firearm. (*Id.*)

16          **1.    Applicable Law**

17          The Double Jeopardy Clause of the Fifth and Fourteenth Amendments protects

18  defendants from a second prosecution for the same offense after acquittal or conviction,

19  and against multiple punishments for the same offense. *Ohio v. Johnson*, 467 U.S. 493,

20  498 (1984). One offense is different from another if each requires proof of a fact that the

21  other does not. *Wilson v. Czerniak*, 355 F.3d 1151, 1154 (9th Cir. 2004) (citing

22  *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).

23          "Nevada uses the *Blockburger* test to determine whether multiple convictions

24  arising from a single incident are permissible, or to the contrary, if the charges amount to

25  a lesser-included offense that is barred by double jeopardy." *Wilson v. State*, 114 P.3d

26  285, 294 (Nev. 2005). "[I]f the elements of one offense are entirely included within the

27  elements of a second offense, the first offense is a lesser included offense, and the

28

1  Double Jeopardy Clause prohibits a conviction for both offenses." *Id.* (citations and
2  quotation marks omitted).

3        **2.     Analysis**

4        On direct appeal, the Nevada Supreme Court determined the convictions for
5  assault with the use of a deadly weapon and discharging a firearm within and from a
6  structure are not lesser-included offenses of robbery with the use of a firearm and
7  therefore the convictions do not constitute a double jeopardy violation:

8       [A]ppellant contends that his convictions for assault with a deadly weapon
        or for discharging a firearm within or from a structure are lesser-included
9       offenses of robbery with the use of a firearm and therefore violate double
        jeopardy. To determine whether two statutes punish the same offense, this
10      court looks to the *Blockburger* test. *See Blockburger v. United States*, 284
        U.S. 299 (1932). "The *Blockburger* test 'inquires whether each offense
11      contains an element not contained in the other; if not, they are the "same
        offense" and double jeopardy bars additional punishment and successive
12      prosecution.'" *Jackson v. State*, 128 Nev.      ,      , 291 P.3d 1274, 1278
        (2012) (quoting *United States v. Dixon*, 509 U.S. 688, 696 (1993)); *see also*
13      *Barton v. State*, 117 Nev. 686, 692, 30 P.3d 1103, 1107 (2001) ("under
        *Blockburger*, if the elements of one offense are entirely included within the
14      elements of a second offense, the first offense is a lesser included offense
        and the Double Jeopardy Clause prohibits a conviction for both offenses"),
15      *overruled on other grounds by Rosas v. State*, 122 Nev. 1258, 147 P.3d
        1101 (2006).
16
        Here, appellant concedes that assault with a deadly weapon is not a
17      lesser-included offense of simple robbery but argues that it is a lesser-
        included of the crime charged, robbery with the use of a firearm. He further
18      claims that discharging a firearm within or from a structure is a lesser-
        included crime to robbery with the use of a firearm when the armed robbery
19      occurred within a store. He contends that the robbery, as charged, could
        not be committed without first committing assault with a deadly weapon and
20      discharging a firearm within or from a structure.

21           [FN 2] Again, we could exercise our discretion to treat
        the State's failure to respond to this claim as a confession of
22      error, *see Polk*, 126 Nev. at      , 233 P.3d at 359-60; *Bates*,
        100 Nev. at 681-82, 691 P.2d at 870, but we decline to do so.
23
        Each of appellant's convictions requires proof of an element that the others
24      do not, *compare* NRS 200.380(1) *and* NRS 193.165(1) *with* NRS
        200.471(1)(a), (2)(b) *and with* NRS 202.287(1)(b), therefore, his convictions
25      do not violate the Double Jeopardy Clause, *see Iannelli v. United States*,
        420 U.S. 770, 785 n.17 (1975) ("If each requires proof of a fact that the
26      others do not, the Blockburger test is satisfied, notwithstanding a substantial
        overlap in the proof offered to establish the crimes").
27
28  (ECF No. 11-11 at 5-6.)

1       In post-conviction review proceedings, the state appellate court rejected a

2   challenge that trial counsel was deficient in failing to move for mistrial based on double

3   jeopardy:

4       [M]iranda-Rivas claimed trial counsel was ineffective for failing to move for

5   a mistrial based on a double-jeopardy violation. Miranda-Rivas argued the offenses of assault with a deadly weapon and discharging a firearm within or from a structure are lesser-included offenses of robbery with the use of

6   a firearm, his assault-with-a-deadly-weapon conviction cannot stand, and his sentences for robbery with the use of a firearm and discharging a firearm

7   within or from a structure should merge. The district court found the Nevada Supreme court had rejected Miranda-Rivas' double jeopardy challenge on

8   direct appeal, Miranda-Rivas' convictions do not violate the Double Jeopardy Clause, trial counsel was not deficient for failing to move for a

9   mistrial or resentencing, and Miranda-Rivas was not prejudiced. The district court's findings are supported by the record and we conclude it did not err

10  in dismissing this claim. *See Miranda-Rivas v. State*, Docket No. 64687 (Order of Affirmance, October 15, 2014); *Donovan*, 94 Nev. at 675, 584

11  P.2d at 711.

12  (ECF No. 11-20 at 7.)

13      The state appellate court's determination is neither contrary to, nor an

14  unreasonable application of *Strickland*'s performance prong and is not based on an

15  unreasonable determination of the facts. The Nevada Supreme Court, as the final arbiter

16  of state law, determined the convictions for assault with a deadly weapon and discharging

17  a firearm within and from a structure are not lesser-included offenses for robbery with the

18  use of a firearm, and therefore did do violate federal double jeopardy. Because the lesser

19  included/double jeopardy theory has no merit, the state appellate court reasonably

20  concluded trial counsel's failure to move for acquittal or merger of the convictions based

21  on that theory does not constitute deficient performance as it did not fall below an

22  objective standard of reasonableness. Miranda-Rivas is therefore not entitled to federal

23  habeas relief for ground 7.

24      **E.   Ground 8—Sufficiency of Evidence (Corroboration)**

25      In ground 8, Miranda-Rivas alleges there is insufficient evidence to support each

26  of his four convictions because there was insufficient corroboration for the accomplices'

27  testimony, in violation of the Fifth and Fourteenth Amendments. (ECF No. 56 at 30-33.)

28

1          **1.     Applicable Law**

2          According to *Jackson v. Virginia*, a jury's verdict must stand if, "after viewing the

3  evidence in the light most favorable to the prosecution, *any* rational trier of fact could find

4  the essential elements of the offense beyond a reasonable doubt." 443 U.S. 307, 319

5  (1979) (emphasis in original). A federal habeas petitioner faces a "considerable hurdle"

6  when challenging the sufficiency of evidence to support his conviction. *Davis v. Woodford*,

7  384 F.3d 628, 639 (9th Cir. 2004). The *Jackson* standard is applied "with explicit reference

8  to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting

9  *Jackson*, 443 U.S. at 324 n.16.) A reviewing court, "faced with a record of historical facts

10  that supports conflicting inferences must presume—even if it does not affirmatively

11  appear in the record—that the trier of fact resolved any conflicts in favor of the

12  prosecution, and must defer to that resolution." *Id.* (quoting *Jackson*, 443 U.S. at 326.)

13          When the deferential standards of AEDPA and *Jackson* are applied together, the

14  question for decision on federal habeas review is whether the state court's decision

15  unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g., Juan H. v.*

16  *Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005) (citations omitted). Thus, when a

17  petitioner's challenge to the sufficiency of the evidence is subject to AEDPA, "there is a

18  double dose of deference that can rarely be surmounted." *See Boyer v. Belleque*, 659

19  F.3d 957, 964-65 (9th Cir. 2011) (noting the *Jackson* standard is deferential because it

20  only permits relief when "no rational trier of fact" could find the essential elements for guilt

21  beyond a reasonable doubt, and AEDPA "adds a second level of deference" by permitting

22  relief only where a state court's application of *Jackson* is "objectively unreasonable")

23          In contrast with a claim of sufficiency of evidence to support a conviction, the Ninth

24  Circuit has held challenges to the sufficiency of the evidence corroborating accomplice

25  testimony as a requirement of state law, do not implicate federal constitutional concerns.

26  *See Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000) (stating that a state statutory

27  rule requiring corroboration for accomplice testimony, to the extent the accomplice

28  testimony is neither incredible nor insubstantial on its face "is not required by the

1  Constitution or federal law") (citing *United States v. Necoechea,* 986 F.2d 1273, 1282 (9th

2  Cir.1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a

3  conviction unless it is incredible or insubstantial on its face.")). Habeas relief for

4  uncorroborated accomplice testimony may lie only if the alleged state court violation

5  denied the petitioner a due process right to fundamental fairness. *Laboa*, 224 F.3d at 979

6  (citing *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991)). "A State violates a criminal

7  defendant's due process right to fundamental fairness if it arbitrarily deprives the

8  defendant of a state law entitlement." *Laboa*, 224 F.3d at 979 (citing *Hicks v. Oklahoma*,

9  447 U.S. 343, 346 (1980)).

10        **2.      Analysis**

11        On direct appeal, the Nevada Supreme Court rejected Miranda-Rivas's claim that

12  there was insufficient evidence to support each of the four convictions:

13        [A]ppellant claims that there was insufficient evidence for his convictions
       because they were based solely on the testimony of his accomplices. *See*
14     NRS 175.291. As second appellate counsel conceded in his supplemental
       fast track statement, there is ample independent evidence to corroborate
15     the accomplices' testimony with regards to robbery with the use of a firearm,
       discharging a firearm within or from a structure, and assault with a deadly
16     weapon. Therefore, we conclude these claims lack merit. *See Jackson v.
       Virginia*, 443 U.S. 307, 319 (1979) (the proper inquiry for a claim of
17     insufficient evidence is whether the evidence, when viewed in the light most
       favorable to the prosecution, is sufficient to establish guilt beyond a
18     reasonable doubt as determined by a rational trier of fact); *Mitchell v. State*,
       124 Nev. 807, 816, 192 P.3d 721, 727 (2008); *Ramirez-Garza v. State*, 108
19     Nev. 376, 379, 832 P.2d 392, 393 (1991) ("The evidence required to
       corroborate accomplice testimony need not, in itself, be sufficient to
20     establish guilt. If the evidence, independent of the accomplice testimony,
       tends to connect the accused with the commission of the offense, then the
21     corroboration requirement contained in NRS 175.291 is satisfied.").

22  (ECF No. 11-11 at 2-3.)

23        **a.      Deferential Disposition of Ground 8(A)[8]**

24        "Robbery is the unlawful taking of personal property from the person of another, or

25  in the person's presence, against his or her will, by means of force or violence or fear of

26

27        [8]Ground 8 is subdivided. Ground 8(A) concerns the claim for the convictions for
     robbery with a firearm and discharge of a firearm within or from a structure and Ground
28  8(B) concerns the claim for the conviction for assault with a deadly weapon. Ground 9
     addresses the claim for the conviction for grand larceny of a motor vehicle.

injury, immediate or future, to his or her person or property . . .." NRS § 200.380, *as enacted by* Laws 1995, p. 1187. NRS § 193.165 provides an additional and consecutive punishment for a crime in which "any person who uses a firearm or other deadly weapon . . . in the commission of a crime."

"A person who is in . . . a structure . . . and who maliciously or wantonly discharges or maliciously or wantonly causes to be discharged a firearm within or from the structure" is guilty of a felony "[i]f the structure or vehicle is within an area designated by city or county ordinance as a populated area for the purpose of prohibiting the discharge of weapons . . . ." NRS § 202.287(1)(b), *as enacted by* Laws 2003, c. 197, § 1.

The state court record confirms the Nevada Supreme Court's determination that appellate counsel conceded "the testimonies regarding the armed robbery and the discharge of the weapon inside of the Chevron Mini-mart are amply corroborated by independent evidence." (ECF No. 11-8 at 3.) As such, the Nevada Supreme Court reasonably evaluated whether there was sufficient evidence to support the convictions for robbery with the use of a firearm and discharge of a firearm within and from a structure, without considering whether the accomplice testimony was independently corroborated.

The Nevada Supreme Court also reasonably concluded that, viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented for a rational jury to find Miranda-Rivas guilty of each essential elements of robbery, that a firearm was used during the robbery, and discharge of a firearm within or from a structure, beyond a reasonable doubt. Miranda-Rivas talked about robbing the Chevron, directed K.A. to park behind the Chevron, and exited the vehicle with, or wearing, a red bandana. The Chevron attendant, Robertson, said a robber wearing a red bandana over his face and a blue ski jacket, held a gun to his head and demanded money. When Robertson brushed him off, the robber shot the firearm inside the mart and repeated the demand for money. Robertson placed the cash register drawer on the counter because of the way the robber threatened him, and the robber took $450 from it and then left. Chevron surveillance video depicted the robber pointing the gun at Robertson's head and firing the

28

gun inside in mart. Detective Sawyer testified the Chevron station is located in a densely populated area where the discharge of firearms is prohibited by law except in self-defense. Miranda-Rivas returned to the car, distributed cash to K.A., E.G., and Torres, and bragged about pistol-whipping the Chevron attendant and shooting the gun. K.A. told police that Miranda-Rivas bragged about pistol-whipping the Chevron attendant. The Chevron attendant testified the jacket worn by the robber was similar to the jacket found at the scene of the Subaru theft. K.A., E.G., and Torres said the jacket depicted in a photograph of the Chevron robber and in a photograph of the jacket found at the scene of the stolen Subaru, were similar to the jacket worn by Miranda-Rivas. Police found bullet fragments at the Chevron that matched the caliber of a bullet located in a vehicle that Miranda-Rivas previously drove. And, finally, Miranda-Rivas made incriminating statements in phone calls and in a postcard from which a rational jury could infer he wore the jacket when he robbed Robertson, and therefore fired the bullet inside the mart, and he alone committed the robbery.

Based on the record, the Nevada Supreme Court reasonably determined there was sufficient evidence for the convictions of robbery with a firearm and discharging a firearm under *Jackson*. Accordingly, Miranda-Rivas is not entitled to federal habeas relief for ground 8(A).

### b.   *De Novo* Review of Ground 8(B)

The Court finds the record clearly and convincingly demonstrates Miranda-Rivas did not concede in his direct appeal that there was sufficient corroboration for the accomplices' testimony concerning the assault with a deadly weapon conviction.[9] *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (A statement of facts "drawn from the state appellate court's decision ... is afforded a presumption of correctness that may be

---

[9]Miranda-Rivas's initial appellate counsel challenged the sufficiency of independent corroboration for the accomplices' testimony for the assault with a deadly weapon charge. (ECF No. 11-5 at 13.) However, his second appellate counsel disagreed with initial appellate counsel and expressly conceded only that there was sufficient corroboration for the conviction for armed robbery and discharging a firearm inside the Chevron. (ECF No. 11-8 at 3.)

1  rebutted only by clear and convincing evidence.") (citing 28 U.S.C. § 2254(e)(1)). As

2  such, the Nevada Supreme Court's determination that Miranda-Rivas conceded that point

3  before it considered the sufficiency of the evidence for that offense was based on an

4  unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). *See Panetti v.*

5  *Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review

6  of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally

7  requires"); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine,

8  considering only the evidence before the state court, that . . . the state court's decision

9  was based on an unreasonable determination of the facts, we evaluate the

10  claim de novo.").

11          On *de novo* review, the Court finds the jury's consideration of the accomplices'

12  testimony did not arbitrarily and unfairly deprive Miranda-Rivas of the independent

13  corroboration requirement for the accomplice testimony afforded by Nevada law.

14  *See Estelle,* 502 U.S. at 72-73.

15          "Assault means: (1) Unlawfully attempting to use physical force against another

16  person; or (2) Intentionally placing another person in reasonable apprehension of

17  immediate bodily harm." NRS § 200.471, as amended by Laws 2011, c. 273, § 51, eff.

18  Jan. 1, 2012. The jury was instructed that Miranda-Rivas could not be convicted solely on

19  the accomplices' testimony and consideration of the accomplices' testimony was

20  predicated on the existence of evidence that independently corroborated their testimony.

21  Trial counsel and the State attorney each explained to the jury the independent

22  corroboration requirement and trial counsel argued the State failed to meet that

23  requirement. Nothing about the accomplice testimony was incredible nor insubstantial,

24  and to the extent their testimony was inconsistent or contradictory, explanations were

25  presented for the jury to make its own determination of the weight and credibility, if any,

26  it gave to that testimony. *See Laboa,* 224 F.3d at 979. Thus, the accomplice testimony

27  may rightly be considered in assessing the sufficiency of the evidence to support the

28  conviction for assault with a deadly weapon as proscribed by *Jackson.*

1    Viewing the evidence in the light most favorable to the prosecution, and for the

2    reasons set forth in ground 8(A), the Court finds that, as a matter of deferential or *de novo*

3    review, a rational jury could find Miranda-Rivas guilty of the essential elements of the

4    crime of assault with a deadly weapon beyond a reasonable doubt. Accordingly, Miranda-

5    Rivas is not entitled to federal habeas relief for ground 8(B).

6    **F.    Ground 9—Sufficiency of Evidence (Grand Larceny)**

7    In ground 9, Miranda-Rivas alleges there is insufficient evidence to support his

8    conviction for grand larceny of a motor vehicle because there was insufficient

9    corroboration for the accomplices' testimony, in violation of the Fifth and Fourteenth

10   Amendments. (ECF No. 56 at 33-35.)

11   NRS § 205.228(1) states: "A person who intentionally steals, takes and carries

12   away, drives away or otherwise removes a motor vehicle owned by another person

13   commits grand larceny of a motor vehicle."

14   On direct appeal, the Nevada Supreme Court rejected a claim of insufficiency of

15   evidence for the conviction for grand larceny of a motor vehicle:

> We also disagree with appellant's claim that insufficient corroborating
> evidence was presented on the charge of grand larceny of a motor vehicle.
> The evidence, when viewed in the light most favorable to the State, is
> sufficient to establish guilt beyond a reasonable doubt as determined by a
> rational trier of fact. *See Jackson*, 443 U.S. at 319; *Mitchell*, 124 Nev. at
> 816, 192 P.3d at 727. At trial, the State presented testimony from the
> accomplices that, while looking for unlocked cars to enter and steal from,
> appellant found a Subaru that was unlocked and had the keys inside of it.
> The accomplices testified that after appellant robbed the gas station, they
> returned to the Subaru and, when one accomplice failed to start it, appellant
> got into the Subaru, started it, and drove away. The gas station employee
> testified that the robber wore a blue, puffy ski jacket with striping on the
> sleeve and sideways stitching. A blue, puffy down jacket was discovered on
> a snow bank, fifteen to twenty feet from where the Subaru was last parked.
> The gas station employee identified the jacket from the snow bank as
> looking like the same jacket the robber wore. Furthermore, while speaking
> with his brother on a recorded jail call, appellant claimed that there was no
> proof, except that somebody snitched and "that they found the jacket."
> When his brother said that he heard appellant dropped the jacket in the
> Subaru and that the owner of the car had the jacket, appellant asked him,
> "[h]ow you know about it?" We conclude that the jury could have reasonably
> inferred from the evidence presented that appellant committed grand
> larceny of a motor vehicle. *See* NRS 205.228(1); *Ramirez-Garza*, 108 Nev.
> at 379, 832 P.2d at 393. A jury's verdict will not be disturbed on appeal
> where, as here, it is supported by sufficient evidence. *See Bolden v. State*,
> 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

1   (ECF No. 11-11 at 3-4.)

2           The Nevada Supreme Court determined, as a matter of state law, that there was

3   sufficient independent corroboration for the accomplice testimony as to the grand larceny

4   of a motor vehicle charge and the Court defers to that finding. There is no basis to

5   conclude Miranda-Rivas was denied the benefit of state law requirements for accomplice

6   testimony and the accomplice testimony was neither insubstantial nor incredible. The

7   Nevada Supreme Court's determination that there was sufficient evidence to support the

8   grand larceny conviction is also neither contrary to nor an unreasonable application of

9   *Jackson* and is not based on an unreasonable determination of the facts. A rational jury

10  could find each of the essential elements of the crime were met by the evidence. Torres

11  testified Miranda-Rivas said they should leave town after the Chevron robbery because

12  he thought the Chevron attendant called police. K.A., E.G., and Torres each testified

13  Miranda-Rivas stole the Subaru by starting it and driving it away. Torres testified Miranda-

14  Rivas stole the Subaru to evade police. Police found a jacket similar to the jacket worn

15  by the Chevron robber approximately 15 to 20 feet from the location where the Subaru

16  was stolen. And, Miranda-Rivas told his brother police found "the jacket." A rational jury

17  could infer from this evidence that the State proved each essential element of grand

18  larceny of a motor vehicle against Miranda-Rivas.

19          The Nevada Supreme Court's application of *Jackson* to the record was objectively

20  reasonable and Miranda-Rivas is not entitled to federal habeas relief for ground 9.

21          **G.      Ground 11—Double Jeopardy**

22          Miranda-Rivas alleges his convictions for assault with a deadly weapon and

23  discharging a firearm within or from a structure are lesser included offenses of robbery

24  with the use of a deadly weapon in violation of double-jeopardy under the Fifth and

25  Fourteenth Amendments. (ECF No. 56 at 36-38.) As discussed, the Nevada Supreme

26  Court, as the final arbiter of state law, determined the convictions for assault with a deadly

27  weapon and discharging a firearm from or within a structure are not lesser-included

28

1   offenses for robbery with the use of a firearm.[10] Thus, the Nevada Supreme Court's

2   determination that the convictions do not violate double jeopardy is neither contrary to nor

3   an unreasonable application of Federal law as determined by the Supreme Court and is

4   not based on an unreasonable determination of the facts. Accordingly, Miranda-Rivas is

5   not entitled to federal habeas relief for ground 11.

6   **V.   CERTIFICATE OF APPEALABILITY**

7        This is a final order adverse to Miranda-Rivas. Rule 11 of the Rules Governing

8   Section 2254 Cases requires this Court to issue or deny a certificate of appealability

9   ("COA"). This Court therefore has *sua sponte* evaluated the claims within the petition for

10  suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281

11  F.3d 851, 864-65 (9th Cir. 2002). Under § 2253(c)(2), a COA may issue only when the

12  petitioner "has made a substantial showing of the denial of a constitutional right." With

13  respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable

14  jurists would find the district court's assessment of the constitutional claims debatable or

15  wrong." *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

16  Applying this standard, the Court finds a certificate of appealability is not warranted for

17  any of the grounds in the petition.[11] *See Slack,* 529 U.S. at 484.

18  **VI.   CONCLUSION**

19       The Court notes that the parties made several arguments and cited to several

20  cases not discussed above. The Court has reviewed these arguments and cases and

21

22       [10]At the relevant time, assault could be committed either by: (1) unlawfully
    attempting to use physical force against another person; or (2) intentionally placing
23  another person in reasonable apprehension of immediate bodily harm. NRS § 200.471,
    *as amended by* Laws 2011, c. 273, § 51, eff. Jan. 1, 2012. The Information charged
24  Miranda-Rivas with the second type of assault, which, unlike the first type, requires a
    specific intent to place another person in reasonable apprehension of immediate bodily
25  harm. (ECF No. 11-2 at 4.) Robbery is a general intent crime. *Compare* NRS § 200.380
    *and* NRS § 193.165 *with* NRS § 200.471; *see also Burnside v. State*, 131 Nev. 503, 508
26  (1981) (confirming robbery is a general intent crime in Nevada).

27       [11]Reasonable jurists would additionally not find the Court's dismissal of grounds 1,
    2, and 4 as untimely, debatable or wrong and reasonable jurists would not find it debatable
28  whether this Court was correct in its procedural ruling dismissing grounds 10 and 12 as
    unexhausted. (ECF Nos. 83, 84, 87, 88.)

1   determines that they do not warrant discussion as they do not affect the outcome of the

2   issues before the Court.

3        It is therefore ordered that the third amended petition for writ of habeas corpus

4   (ECF No. 56) is denied in its entirety.[12]

5        It is further ordered that a certificate of appealability is denied as to all grounds.

6        The Clerk of Court is directed to substitute Wiliam Gittere for respondent Harold

7   Wickham.

8        The Clerk of Court is further directed to enter judgment accordingly and close this

9   case.

10       DATED THIS 26th Day of May 2022.

11

12                                           _____

13                                           MIRANDA M. DU
                                            CHIEF UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____
[12]The request for an evidentiary hearing is likewise denied. (ECF No. 56 at 39.)